UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | | |
|---|---|---|
| HOLLY LAWSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 3:22-cv-00023-GFVT |
| | ) | |
| KAYLA CREELY, *et al.*, | ) | **OPINION** |
| | ) | **&** |
| Defendants. | ) | **ORDER** |
| | ) | |

*** *** *** ***

"If you see something, say something."  This slogan embodies a responsibility that we, as Americans, must persistently weigh in a twenty-first century world rife with uncertainty. Contemporaneously, the United States Constitution specifically guarantees us the liberty to be free from unreasonable searches and seizures.  U.S. Const. amend. IV.  Thus, there are times where our responsibility to "say something" comes into tension with another's protected liberties.  This case exemplifies that tension.

What happens, then, when two school employees suspect that their colleague is under the influence of prescription medication, search her bag without permission, and find a firearm inside?  And what happens when school board officials find out and want to question the perpetrator?  Has the Fourth Amendment been transgressed?  Plaintiff Holly Lawson says yes; her colleagues, and the Franklin County Board of Education, say no.  Before the Court are cross Motions for Summary Judgment from Ms. Lawson [**R. 47; R. 52**,] and from Defendants Kayla Creely, Lori Franke, Mark Kopp, and the Board.  [**R. 30; R. 51**.]  For the reasons that follow, Ms. Lawson's motions will be **DENIED** and the Defendants' motions will be **GRANTED**.

**I**

The facts of this case are relatively straightforward and, for the most part, undisputed. On May 4, 2021, Kayla Creely, a guidance counselor at Franklin County High School, and Lori Franke, the registrar, became concerned with the behavior of their co-worker, guidance counselor Holly Lawson.  [R. 30-1 at 2-3.]  According to Creely and Franke, Ms. Lawson was, in their opinion, acting abnormally—she was slurring her words and appeared intoxicated.  *Id.* at 2. This behavior coincided with their observations of Ms. Lawson taking some form of pill medication on that day and on the day prior.  *Id.*

What happened next became the impetus for this suit.  At some point around midday on May 4, Ms. Lawson left her office in the guidance suite and drove away from Franklin County High School.  *Id.*; [R. 47 at 4.]  Curious as to where Ms. Lawson might be going, Creely and Franke went to Ms. Lawson's office in order to gain a better vantage point of the school parking lot.  [R. 30-1 at 2; R. 47 at 5.]  While they did not see Ms. Lawson's car in its usual spot, something else caught their eye—Ms. Lawson's Louis Vuitton Neverfull purse, laying underneath her desk.  [R. 30-1 at 3; R. 47 at 5.]  Motivated by an interest in what medications Ms. Lawson may have been taking, Creely and Franke decided to investigate.  [R. 30-1 at 3; R. 47 at 5.]  Creely and Franke walked around Ms. Lawson's desk, where Creely bent down to begin her rummage through Ms. Lawson's purse.  [R. 30-1 at 3; R. 47 at 5.]  After removing multiple pill bottles to peek at their labels, Creely went to place the pill bottles back in the bag. [R. 30-1 at 3; R. 47 at 5.]  It was at this point that Creely and Franke noticed what they thought was a pistol grip inside of Ms. Lawson's purse.  [R. 30-1 at 3; R. 47 at 5.]

Rather than reporting what they had seen, however, Creely and Franke remained silent as to their discovery.  [R. 30-1 at 3-4.]  That is, until Ashley Reid, a clinical social worker for the

students of Franklin County, came later that day to discuss a student with Creely.  *Id*. at 4.  While
Ms. Reid was in Creely's office, the conversation turned to Ms. Lawson and, eventually, Ms.
Reid was told about the pistol in Ms. Lawson's purse.  *Id*.; [R. 47 at 7.]  Reid, in turn, reported
what she had been told to Deputy Marvin Kelly, who then reported the information to Officer
Jeff Abrams, Franklin County Public Schools' Safety Coordinator.  [R. 30-1 at 4; R. 47 at 7.]
Officer Abrams subsequently informed Superintendent Mark Kopp.  [R. 30-1 at 4-5; R. 47 at 7.]

On the next morning, May 5, 2021, Superintendent Kopp greeted Ms. Lawson at the front
entrance of Franklin County High School.  [R. 30-1 at 5; R. 47 at 7.]   Superintendent Kopp
escorted Ms. Lawson to the office of one of the School Resource Officers, where he informed
her of reports he had received about her possessing a firearm on school property.  [R. 30-1 at 5;
R. 47 at 7-8.]  Also present in the office were Deputy Kelly and Officer Abrams.  [R. 30-1 at 5;
R. 47 at 7.]   After equivocating as to Superintendent Kopp's comments, Ms. Lawson emptied
the contents of her Louis Vuitton purse where, at the bottom, laid a pistol.  [R. 51 at 8.]
Superintendent Kopp immediately informed Ms. Lawson that she was placed on suspension,
while Officer Abrams and Deputy Kelly snapped photographs of the pistol laying inside of the
purse.  *Id*.; [R. 30-1 at 5.]  Officer Abrams then escorted Ms. Lawson to his official vehicle in the
parking lot and drove Ms. Lawson to the Franklin County Sheriff's Office, where she was
formally arrested for possessing a firearm on school property.  [R. 30-1 at 5.]

In May 2022, Ms. Lawson filed a Section 1983 claim against the four defendants:
Creely, Franke, Superintendent Kopp, and the Franklin County Board of Education.  [R. 1.]  Ms.
Lawson alleges that Creely and Franke violated her Fourth Amendment right to be free from
unreasonable searches when they perused the contents of her Louis Vuitton purse on the
afternoon of May 4.  *Id*. at 6-8.  Ms. Lawson also alleges that Superintendent Kopp's actions on

3

May 5 resulted in an illegal search and seizure in violation of her Fourth Amendment rights.  *Id.* at 6-8.  She further contends that the Board of Education is liable under *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658 (1978).  *Id.* at 8.  Discovery ensued and has concluded.  Now before the Court are cross-motions for summary judgment.  [*See* R. 30; R. 47; R. 51; R. 52.]  The matter being fully briefed, the Court turns to the pending motions.

## II

Summary judgment is appropriate when the pleadings, discovery materials, and other documents in the record show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a);  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).  "A genuine dispute exists on a material fact, and thus summary judgment is improper, if the evidence shows 'that a reasonable jury could return a verdict for the nonmoving party.'"  *Olinger v. Corp. of the Pres. of the Church*, 521 F. Supp. 2d 577, 582 (E.D. Ky. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). The moving party has the initial burden of demonstrating the basis for its motion and identifying those parts of the record that establish the absence of a genuine issue of material fact.  *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002).  The movant may satisfy its burden by showing "that there is an absence of evidence to support the non-moving party's case."  *Celotex Corp.*, 477 U.S. at 325.  Once the movant has satisfied this burden, the non-moving party must go beyond the pleadings and come forward with specific facts demonstrating there is a genuine issue in dispute.  *Hall Holding*, 285 F.3d at 424 (citing *Celotex Corp.*, 477 U.S. at 324).

The Court must then determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir.

1989) (quoting *Anderson*, 477 U.S. at 251-52). In doing so, the Court must review the facts and

draw all reasonable inferences in favor of the non-moving party. *Logan v. Denny's, Inc.*, 259

F.3d 558, 566 (6th Cir. 2001). Summary judgment is inappropriate where there is a genuine

conflict "in the evidence, with affirmative support on both sides, and where the question is which

witness to believe." *Dawson v. Dorman*, 528 F. App'x 450, 452 (6th Cir. 2013).

## A

The Court first considers Ms. Lawson's claim against her colleagues, Creely and Franke.

The Fourth Amendment to the United States Constitution enshrines "[t]he right of the people to

be secure in their persons . . . and effects . . . against unreasonable searches and seizures." U.S.

Const. amend. IV. The Fourth Amendment applies to actions of both the federal government and

the states. *See Mapp v. Ohio*, 367 U.S. 643. A claim brought under 42 U.S. § 1983 provides "a

method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386,

394 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144, n. 3 (1979)). To succeed on a

section 1983 claim, a plaintiff must establish (1) that the defendant was acting "under the color

of state law," and (2) that the defendant's action deprived plaintiff of "rights secured by federal

law." *League of Women Voters v. Brunner*, 548 F.3d 463, 475 (6th Cir. 2008) (internal citations

omitted). As to the first element, "a defendant must be acting in a state capacity to be liable

under the statute." *Lindke v. Freed*, 37 F.4th 1199, 1202 (6th Cir. 2022)[1]. Put more simply,

there must be "state action" where the defendant's actions are "fairly attributable to the State."

*Id*. (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)). The parties dispute

---

[1] The Court is aware that the Sixth Circuit's judgment in *Lindke* has been vacated by the Supreme Court to the extent that the Supreme Court's test differs from the one applied by the Sixth Circuit. *Lindke v. Freed*, 601 U.S. 187, 204 (2024). In its recent decision, the Supreme Court adopted a new test to determine specifically when a public official's use of social media constitutes state action for First Amendment purposes. The general framework for determining where state action exists in other contexts not related to social media appears to remain unchanged. Thus, here, the Court determines that the Sixth Circuit's articulation of the state-action doctrine, and more precisely this Circuit's state-official test, in *Lindke* is still applicable and relevant to the present case.

whether Creely's and Franke's actions are attributable to the State.

**1**

A person "acts under color of state law when he abuses the position given to him by the state." *Waters v. City of Morristown*, 242 F.3d 353, 359 (6th Cir. 2001) (internal citation omitted). Accordingly, "Section 1983 is generally not implicated unless a state actor's conduct occurred in the course of performing an actual or apparent duty of his office, or unless the conduct is such that the actor could not have behaved as he did without the authority of his office." *Id.* Not every action undertaken by a state actor is attributable to the state. *Id.* "When a state official acts 'in the ambit of [his] personal, private pursuits,' section 1983 doesn't apply." *Lindke*, 37 F.4th at 1202 (quoting *Stengel v. Belcher*, 522 F.2d 438, 441 (6th Cir. 1975)). There is a line drawn between actions taken in an official capacity and those taken in a personal one. *Id.* "The key determinant is whether the actor intends to act in an official capacity or to exercise official responsibilities pursuant to state law." *Waters*, 242 F.3d at 359.

Altogether, the above is what the Sixth Circuit has called the "state-official test." *See Lindke*, 37 F.4th at 1202. As Judge Thapar explains, "it stems from our recognition that public officials aren't just public officials—they're individual citizens, too." *Id.* The state-official test, ultimately, is a version of the Supreme Court's nexus test, which asks whether a defendant's action "may be fairly treated as that of the State itself." *Id.* (citing *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974). Essentially, the Court must analyze whether the defendant's actions are "controlled by the government or entwined with its policies." *Id.*; *see also Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001).

Here, we apply this framework to determine whether the search by Defendants Creely and Franke can be fairly attributed to that of the state and thus satisfy the "state-action" element

of a section 1983 claim.  Defendants Creely and Franke argue that although they were both employees of the Franklin County Board of Education at the time when they looked into Ms. Lawson's bag, neither of them were acting as agents of law enforcement nor the Board.  [R. 30-1 at 11.]  They assert that neither of them had any authority to "snoop" in Ms. Lawson's bag, nor were they exercising their responsibilities in their roles as a Guidance Counselor or Registrar. *Id*. at 12.  Rather, they claim that the record indicates that both of them were motivated for private reasons—that is, out of concern and curiosity given Ms. Lawson's demeanor prior to leaving.  *Id.*  In fact, argue Creely and Franke, had they acted for state purposes, they would have reported immediately their observations of the gun in Ms. Lawson's bag, as required by Board Policy 09.2211 and Kentucky law.  *Id*.; [*see* R. 54 at 7];  *see also* Ky. Rev. Stat. Ann. § 158.155(4)(a)(1)(a).  Finally, the Board too asserts that neither Creely nor Franke were acting as agents of the board—that Creely and Franke "departed from their job duties and responsibilities and unilaterally undertook to snoop in Lawson's personal possessions."  [R. 51 at 12.]

Ms. Lawson, in contrast, argues that Creely and Franke were acting under color of state law because their snooping occurred during the course of performing the duties of their office. [R. 46 at 14-15.]  According to Ms. Lawson, school policy afforded Creely and Franke wide discretion.  *Id*. at 14.  She also claims that Creely and Franke were under a directive to protect the safety and well-being of others, and that Creely's testimony reveals that her purpose in entering Ms. Lawson's office was in-part out of concerns for students.  *Id*.  Moreover, argues Ms. Lawson, state action is present "because the search occurred on school property, during school duty hours, and [Creely and Franke] were on the clock being paid" at the time the search occurred.  *Id*. at 15.  And finally, because Creely and Franke "could only access Ms. Lawson's office by virtue of their positions and employment," Creely and Franke could not have behaved

as they did without the authority of their office.  *Id.*

In deciding whether state-action exists for section 1983 purposes, the Court must quickly dispose of another argument asserted by Defendants Creely and Franke.  They attempt to draw upon the distinction between claims against state officials in their official capacities versus their individual capacities.  The official capacity claims against Creely and Franke were dismissed by the Court upon agreement of the Parties, thus the claims against Creely and Franke are now only in their individual capacities.  [*See* R. 16.]  That fact, however, does not change the Court's section 1983 analysis.  As explained by the Supreme Court in *Hafer v. Melo*, suits against state officials in their official capacities should be treated as suits against the State, whereas personal-capacity suits seek to impose liability upon government officers for actions taken under color of state law.  502 U.S. 21, 25 (1991).  There, the Court expressly held that "state officials, sued in their individual capacities, are 'persons' within the meaning of § 1983."  *Id.* at 31.  Thus, Creely and Franke are not shielded from liability under section 1983 merely because they are only being sued in their individual capacities.  Still, Creely and Franke must have been acting "under the color of state law" to be held liable in their individual capacities.

After careful examination, the Court finds that Creely's and Franke's actions are "fairly attributable to the State."  *See Lugar*, 457 U.S. at 937.  Their conduct, even if motivated by private concern, was conduct taken under color or pretense of state law.  Creely and Franke argue that they were acting outside of the scope of their authority when they entered into Ms. Lawson's office and started through her bag.  But Creely's and Franke's status as school employees is the very thing that enabled them access to Ms. Lawson's office and bag.  *See e.g., McDade v. West*, 223 F.3d 1135, 1140 (9th Cir. 2000) (finding that the defendant was acting under color of law because her "status as a state employee enabled her to access the

[misappropriated] information" and "she invoked the powers of her office to accomplish the offensive act."). It may be true, as Creely and Franke contend, that Ms. Lawson's office door was open, that her tote bag was visible from the door, and that any passerby in the Guidance Suite could have accessed Ms. Lawson's office. [R. 54 at 8.] How could they, therefore, have abused their authority when everyone, not just they, could have entered Ms. Lawson's office? Their very presence in the Guidance Suite, however, appears to be connected to their employment. And the notion that anyone could just stroll into Ms. Lawson's office ignores the reality of societal norms. People do not typically wander into spaces in which they have no reason to be, especially when the space in question is an individual's office at a school. Thus, the idea that Ms. Lawson's office was practically openly accessible to anyone and everyone is unconvincing.

Indeed, section 1983 claims are usually premised on the fact that those cloaked with some actual or apparent authority by the State act in some manner that exceeds the scope of that authority. For example, police officers motivated by personal prejudices still act "under color of" state law when they decide to depart from their duties by breaking into one's home, perform a warrantless search, and commit numerous other abuses. *See Monroe v. Pape*, 365 U.S. 167 (1961) (overruled on other grounds by *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)). And a teacher is a state-actor when he takes advantage of his position to sexually abuse students at school and on school trips. *Wilson v. Webb*, 2000 U.S. App. LEXIS 23585, at *24-25 (6th Cir. Sep. 13, 2000). Police officers are not "authorized" to conduct warrantless searches, and teachers are not "authorized" to sexually abuse their students. But when they use their positions of privilege to act for personal motivations, they are still acting under color of law.

Hence, Creely's and Franke's arguments that their snooping was solely for personal

reasons is unconvincing.  It may be so that Creely and Franke felt obliged to investigate out of private concerns for the well-being of their colleague.  And it may also be so that Creely and Franke were under no authority by school policy to enter Ms. Lawson's office and peruse Ms. Lawson's bag.  But Creely and Franke were on duty during the school day when they entered Ms. Lawson's office, and they used their access as school employees to do so.  In other words, the Court doubts whether Creely and Franke could have acted as they did "without the authority of [their] office." *Waters*, 242 F.3d at 359.  Here, there exists a meaningful relationship between the challenged conduct and Creely's and Franke's status as school employees.  They took advantage of the access afforded to them by their employment status to enter Ms. Lawson's office and subsequently look in her purse. *See Unites States v. Classic*, 313 U.S. 299, 326 (1941) (state action exists where the misuse of power is only possible because of wrongdoer is clothed with authority from the state).  Creely and Franke were, therefore, acting "under color of state law."  Because Ms. Lawson has established that Creely and Franke were state actors, the Court next examines whether Creely and Franke deprived Ms. Lawson of her "rights secured by federal law." *League of Women Voters*, 548 F.3d at 475.

### 2

As stated above, the Fourth Amendment to the United States Constitution enshrines "[t]he right of the people to be secure in their persons . . . and effects . . . against unreasonable searches and seizures."  U.S. Const. amend. IV.  Warrantless searches and seizures "are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *United States v. Lewis*, 81 F.4th 640, 651 (6th Cir. 2023) (quoting *Mincey v. Arizona*, 437 U.S. 385, 390 (1978)).  The burden is on those seeking the exception to show that one exists. *United States v. Jeffers*, 342 U.S. 48, 51 (1951).  Creel and Franke suggest

that the reasonableness of their search should be analyzed under "workplace search" exception. [R. 30-1 at 16.]  Thus, the Court must determine whether the workplace framework applies.

**a**

"Although warrantless searches are presumptively unreasonable under the Fourth Amendment, the Supreme Court has recognized an exception for searches of a public employee's workplace under the special needs doctrine." *James v. Hampton*, 592 Fed. Appx. 449, 454 (6th Cir. 2015) (citing *O'Connor v. Ortega*, 480 U.S. 709, 719-20 (1987)).  An office is clearly within the bounds of the workplace context delineated in *O'Connor*'s special needs doctrine.  *Id.* at 456.  But, as explained by the *O'Connor* plurality, "[n]ot everything that passes trough the confines of the business address can be considered part of the workplace context . . . ."  *O'Connor*, 480 U.S. at 716.  "The appropriate standard for a workplace search does not necessarily apply to a piece of closed personal luggage, a handbag or a briefcase that happens to be within the employer's business address."  *Id*.

In *James*, the Sixth Circuit analyzed whether the *O'Connor* standard for a workplace search should be applied where state investigators searched a locked safe in the office of a judge who was under investigation.  Prior to *James*, no court in the Sixth Circuit had presented the issue of a warrantless search of a locked personal item that a public employee had not been notified would be subject to search.  *See James*, 592 Fed. Appx. at 456.  Thus, the *James* court looked to other circuits that had analyzed and applied *O'Connor*'s language, finding that those circuits "had distinguished the items that were searched either because they were used primarily for purposes related to their employment or because the employees were on notice that their personal items were subject to search."  *Id*.  For example, the Ninth Circuit "up[held] the search of a public employee's personal backpack as he was leaving work because he had been notified

11

that his personal belongings were subject to search at any time in order to discourage employee theft and the search did not go beyond the scope appropriate to search for stolen merchandise." *Id*. at 456-57 (citing *United States v. Gonzalez*, 300 F.3d 1048, 1054-55 (9th Cir. 2002)). Likewise, the Seventh Circuit "up[held] the search of a filing cabinet and storage unit located in her office, but purchased by the employee, because they were purchased primarily for the storage of work-related materials, the plaintiff had purchased the items due to a lack of storage space in her office, and the supervisor had a key at least to the storage unit." *Id*. at 457 (citing *Gossmeyer v. McDonald*, 128 F.3d 481, 490 (7th Cir. 1997) (internal quotations omitted)).

Ultimately, the *James* court distinguished these cases in finding that the plaintiff's safe was not a workplace item and fell "outside the bounds of the special needs exception to the warrant requirement altogether." *Id*. In *James*, the plaintiff claimed that the safe in her office was primarily for personal use. *Id*. She "purchased the safe herself, kept it locked, and used it to store personal items." *Id*. And she used the safe exclusively; she did not authorize her employer to use or access it. *Id*. Moreover, the plaintiff was "not on notice that her safe could be subject to search," and "there was no evidence that others had access to her safe." *Id*. Nor was the safe "generally within the employer's control." *Id*. (quoting *O'Connor*, 480 U.S. at 715). Because the safe was not a workplace item, it became subject to the general rule under the Fourth Amendment. *Id*.

Here, Ms. Lawson asserts that her bag is not a workplace item and that the special needs doctrine does not apply to this context. [R. 46 at 17.] She claims that her bag was latched closed and lay underneath her desk in an office that was closed. [R. 40 at 165; R. 46 at 4-5.] Creely and Franke claim that Ms. Lawson's office was unlocked, and that Ms. Lawson's style of bag cannot be closed. [R. 30-1 at 3.] They admit to seeing Ms. Lawson's bag under her desk. *Id*.

12

Regardless of this disagreement on particulars, the Court finds that, under these circumstances, Ms. Lawson's bag is not part of the workplace context.  Regardless of whether her office door was open or closed on May 4, both parties agree that Ms. Lawson's bag was inside her office and under her desk.  She used her bag for personal use, to store personal items.  [R. 40 at 69-70.]  By the nature of this suit, it is clear that Ms. Lawson did not intend for anyone else to use or access her bag.  And while school policy outlined an expectation that student belongings could be searched for violating school rules or the law [*see* R. 36-11], the record lacks any indication that Ms. Lawson had any notice that her own bag could be searched.  Board policy provides a broad mandate to protect the health and well-being of students and faculty.  [*See e.g.* R. 36-7.]  None of the defendants, however, cite any policy that could have provided Ms. Lawson with any notice that her personal effects could be subjected to a search.  There is also no evidence to suggest that Ms. Lawson's bag was, or would ever be, "generally within" the school's control.  Ms. Lawson's bag is merely one that happened to be located at the school's business address on May 4.  Accordingly, it cannot be considered part of the workplace context, and becomes subject to an archetypal Fourth Amendment analysis.

**b**

"Not all government actions are invasive enough to implicate the Fourth Amendment." *United States v. Warshak*, 631 F.3d 266, 284 (6th Cir. 2010).  "A search occurs when the government infringes upon an expectation of privacy that society is prepared to consider as reasonable." *Id*. (citing *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)) (internal quotations omitted).  Under this definition, the Court must first consider whether a person has a subjective expectation of privacy in the object invaded. *Id.*; *See also United States v. Miller*, 982 F.3d 412, 426 (6th Cir. 2020).  If so, the analysis turns to considering whether society is willing

to recognize that expectation as reasonable.  *Id.*

"Generally, employees, including those who worked in the public sector, have been considered to possess a reasonable expectation of privacy in their possessions and work stations."  *American Postal Wkrs. Un. v. U.S. Postal Serv*, 871 F.2d 556, 559 (6th Cir. 1989) (citing *O'Connor*, 480 U.S. at 715).  This reasonable expectation can be reduced where employees have prior notice that their workspaces were subject to search.  *See American Postal Wkrs. Un.*, 871 F.2d at 560;  *James*, 592 Fed. Appx. at 455.  Here, Ms. Lawson had a reasonable expectation of privacy in her personal bag stowed away in her office.  Her status as a school employee does not mean that she leaves her Fourth Amendment rights at the school doors every morning.  Nor was Ms. Lawson's reasonable expectation reduced.  As explained above, Ms. Lawson was not on notice that her bag might be subject to any kind of search.  True, Ms. Lawson's bag was in her office, which may itself have been an area with a reduced expectation of privacy.  But like the plaintiff's safe in *James*, Ms. Lawson's bag itself was her personal item. She stored personal belongings in it, such as clothing and medications;  such is the nature of a woman's purse.  *See Shealy v. Caldwell*, 16 Fed. App'x 388, 400 (6th Cir. 2001) ("It is beyond doubt that society recognizes that an expectation of privacy in purses is reasonable.").

Moreover, Defendants' arguments that Creely and Franke were not authorized to search Ms. Lawson's bag further supports the conclusion that this case is unlike those where employees have a reduced expectation of privacy.  *Cf. United States v. Broadus*, 7 F.3d 460, 464 (6th Cir. 1993) (where the Sixth Circuit found no reasonable expectation of privacy in a jacket hanging inside a locker where the defendant shared the locker with a coworker and had signed a form acknowledging the authority of postal inspectors to search the locker at any time).  Because Ms. Lawson had a reasonable expectation of privacy in her bag, Creely's and Franke's warrantless

search was per se unreasonable unless they can show that an exception to the warrant requirement existed.

Creely and Franke argue that the plain view exception to the warrant requirement applies. [R. 54 at 14.]  Under the plain view exception, a government agent may seize an object without first obtaining a warrant when four requirements apply:  "(1) the object must be in plain view; (2) the officer must be legally present in the place from which the object can be seen; (3) the object's incriminating nature must be immediately apparent; and (4) the officer must have a right of access to the object." *United States v. Garcia*, 496 F.3d 495, 508 (6th Cir. 2007) (citing *Horton v. California*, 496 U.S. 128, 136-37 (1990)).  Creely's and Franke's attempt to invoke the plain view doctrine fails for multiple reasons.

First, Creely and Franke were not "legally present" in Ms. Lawson's office.  Under the requirement that an officer be legally present in the place from which the object can be seen, a lawful search generally extends to the entire area in which the object of the search may be found. *See United States v. Ross*, 456 U.S. 798, 820-21 (1982).  For example, an officer with a warrant to search a home for illegal weapons also has authority to "open closets, chests, drawers, and containers in which the weapon might be found."  *Id*.  In the present case, Creely and Franke fail to show that they were legally present in Ms. Lawson's office.  Indeed, by admission of the Board, neither Creely nor Franke were exercising their responsibilities as employees when they ventured into Ms. Lawson's office.  [*See* R. 51 at 11.]  Yes, they had *access* to Ms. Lawson's office by nature of their positions.  But they did not have a warrant, nor any other directive, that *permitted* them to be in Ms. Lawson's office.  Because their presence in the office was unauthorized, Creely's and Franke's attempt to extend the plain view doctrine to Ms. Lawson's bag fails.

Furthermore, even if Creely and Franke were permitted to be in Ms. Lawson's office for the purpose of investigating their personal suspicions, their entry into Ms. Lawson's bag was its own independent search.  Creely indicated in her deposition that she took pill containers out of Ms. Lawson's bag in order to investigate what medications Ms. Lawson may have been taking. [R. 38 at 69.]  This action produced an additional invasion of Ms. Lawson's privacy interest because Creely took further action than a simple cursory inspection of objects that were already in plain view.  *See Arizona v. Hicks*, 480 U.S. 321, 325 (1987); *Illinois v. Andreas*, 463 U.S. 765, 771 (1983).  As Justice Scalia explained, "[t]he distinction between looking at a suspicious object in plain view and moving it even a few inches is much more than trivial for purposes of the Fourth Amendment."  *Hicks*, 480 U.S. at 325 (internal quotations omitted).  Simply because Ms. Lawson's bag or its contents may have been visible[2] does not mean that Creely and Franke could, without probable cause, instigate an independent search of its contents.  Accordingly, Creely and Franke violated Ms. Lawson's Fourth Amendment right from unreasonable search when they effected a warrantless search of Ms. Lawson's bag.  Having found that a constitutional violation occurred, the Court must turn to the question of whether Creely and Franke are entitled to qualified immunity for their transgression.

**3**

Violations of constitutional rights by government officials acting under color of state law are generally redressable though a section 1983 action.  *Hearring v. Sliwowski*, 712 F.3d 275, 279 (6th Cir. 2013).  The doctrine of qualified immunity, however, protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established

---

[2] The Court notes that Ms. Lawson's version of the facts is that her bag was not open and that the contents inside were not visible.  The plain view exception fails to apply in either factual scenario.  Accordingly, there is no dispute of material fact that would change the Court's ultimate disposition.

statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  Qualified immunity claims demand a two-step analysis. First, "[t]aken in a light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Second, the Court must determine whether the right was "clearly established." *Id.*  The Court may address the two-step analysis in any order.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Once the qualified immunity defense has been raised, "the burden shifts to the plaintiff, who must demonstrate both that the official violated a constitutional or statutory right, and that the right was so clearly established at the time of the alleged violation 'that every reasonable official would have understood that what he [was] doing violate[d] that right." *Thomas v. Plummer*, 489 F. App'x 116, 119 (6th Cir. 2012) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S. Ct. 2074, 2083 (2011)).  As discussed above, Creely and Franke violated Ms. Lawson's Fourth Amendment right when they searched Ms. Lawson's bag under color of state law.  Thus, the Court turns to whether Ms. Lawson has shown the right was clearly established.

  "A government official will be liable for the violation of a constitutional right only if the right was clearly established in light of the specific context of the case." *Hearring*, 712 F.3d at 279 (internal quotations and citations omitted).  "A right is clearly established if '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* at 279-80 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  In other words, the official must be on notice that his alleged actions were unconstitutional.  *Grawey v. Drury*, 567 F.3d 302, 313 (6th Cir. 2009).  Limitations exist "upon the extent to which a court may rely on holdings in contexts other than the one being considered to demonstrate that a principle has been clearly established."  *Hearring*, 712 F.3d at 280 (internal

quotations and citations omitted).

A case directly on point is not required, however, to demonstrate that a right is clearly established.  *Id.* (citing *al-Kidd*, 131 S. Ct. at 2083).  There may be instances where "[g]eneral statements of the law are capable of giving clear and fair warning to officers even where the very action in question has [not] previously been held unlawful."  *Id.* (internal quotations and citations omitted).  "Some violations of constitutional rights are so obvious that a 'materially similar case' is not required to be clearly established."  *Id.* (citing *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)).  In determining whether a right was clearly established, the Court looks first to decisions of the Supreme Court, then to Sixth Circuit precedents, and then to other courts of appeal.  *Id.* The question is whether these precedents "placed the . . . constitutional question beyond debate." *Id.*  (quoting *al-Kidd*, 131 S. Ct. at 2083).

The Court acknowledges from the outset that the analysis of whether a right is clearly established is generally not an easy one.  The specific determination that must be made here is whether it was clearly established that the Fourth Amendment applies to the actions of two school employees when they intrude on the privacy of a fellow employee's bag.  Ms. Lawson argues that "[t]he reasonableness of an individual's expectation of privacy in a closed purse in a locked office, is not the type of close question that might yield itself to a reasonable misapprehension of clearly established law."  [R. 46 at 20.]  She cites a slew of Fourth Amendment cases decided before their search of Ms. Lawson's bag that would put Creely and Franke on notice that a warrantless search of their coworker's purse was presumptively unreasonable.  *Id.* at 21 (citing *Katz v. United States*, 389 U.S. 347, 357 (1967); *Jeffers*, 342 U.S. at 51; *Shealy*, 16 Fed. App'x 388; *United States v. McClendon*, 86 Fed. Appx. 92 (6th Cir. 2004); *United States v. Waller*, 426 F.3d 838 (6th Cir. 2005)).  Ms. Lawson also asserts that cases

pertaining to improper workplace searches also render the right at issue here clearly established. *Id.* (citing *O'Connor*, 480 U.S. at 716; *United States v. Taketa*, 923 F.2d 665, 673 (9th Cir. 1991); *United States v. Slanina*, 283 F.3d 670, 677 (5th Cir. 2002); *Leventhal v. Knapek*, 266 F.3d 64, 73-74 (2d Cir. 2001); *Schowengerdt v. General Dynamics Corp.*, 823 F.2d 1328 (9th Cir. 1987); *James*, 592 Fed. App'x 449; *American Postal Wkrs. Un.*, 871 F.2d at 559, 561).

 Creely and Franke point out, on the other hand, that there exists "no readily apparent precedent governing these facts." [R. 30-1 at 18.] They argue that prior holdings of the Sixth Circuit and its sister courts were on factually disparate circumstances, and that they have not "so clearly foreshadowed . . . so as to leave no doubt" that an examination of a coworker's bag under these circumstances would be held unconstitutional. *Id.* Thus, contend Creely and Franke, they acted reasonably under the circumstances given the lack of comparable precedent in the federal courts.

Following extensive review, the Court has found no readily apparent case that is analogous to the one at hand. Of course, a case directly on point is not required. *Hearring*, 712 F.3d at 280. Officials can still be on notice that their conduct violates established law even in novel factual circumstances like this one. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Ms. Lawson argues that there exists a robust consensus of Fourth Amendment cases giving Creely and Franke a fair and clear warning that their conduct violates established law. But did Creely and Franke truly have fair and clear warning? Were they on notice? Was their violation of Ms. Lawson's constitutional right so obvious that a 'materially similar case' is not required? The Court responds in the negative because Ms. Lawson's right was not clearly established "in light of the specific context of the case." *See Hearring*, 712 F.3d at 279.

In examining the specific context of the case, the Court first focuses on the parties'

relationship.  Creely and Franke were not Ms. Lawson's supervisors.  Ms. Creely's position of employment was that of a fellow guidance counselor, and Ms. Franke's was that of a registrar. Thus, Creely and Franke can be considered, at their greatest level of responsibility, Ms. Lawson's peers.  This distinction between the role of supervisor and peer matters in the Court's ultimate determination that Creely and Franke did not violate a clearly established right.  Ms. Lawson begs the Court to apply *O'Connor* and its progeny to find that Creely and Franke were on notice that public employees have a reasonable expectation of privacy in the workplace.  But the extensive list of workplace-context cases cited by Ms. Lawson cannot be relied on here.

*O'Connor* and its progeny are distinguishable on their facts.  The search in *O'Connor* was directed and performed by the plaintiff's supervisor.  And in *American Postal Wkrs. Un.*, which Ms. Lawson heavily relies on because it was penned in this circuit, the search was performed by postal inspectors.  Indeed, in every case that Ms. Lawson cites as clearly establishing her right, the search was performed by an employer-supervisor or some embodiment of law enforcement—not by co-workers.  *See Schowengerdt*; 823 F.2d at 1331 (searches of plaintiff's office conducted by Navy security investigators and an Executive Officer and Acting Naval Plant Representative);  *Taketa*, 923 F.2d at 669 (video camera installed in defendant's office by DEA agents);  *Leventhal*, 266 F.3d at 66 (search of plaintiff's computer performed by New York Department of Transportation investigators during the course of an investigation of allegations made against plaintiff);  *Slanina*, 283 F.3d at 673 (challenged search of defendant fire marshal's office computer equipment was performed by the Public Safety Director, who was in charge of the police and fire departments); *James*, 592 Fed. App'x at 452 (search of a judge's office and safe during the course of an official investigation conducted by the Chief Judge of the district and the regional administrator for the Michigan Supreme Court Administrator's Office).

20

None of these cases provide a "clear warning" to the reasonable school employee so as to provide them with sufficient clarity that their actions would be violating a co-worker's constitutional right. And neither is the violation so egregious or obvious that a materially similar case is not required. Creely and Franke, and most school employees for that matter, are not law enforcement officers who understand the intricacies of the Fourth Amendment. Instead, Creely and Franke are non-supervisory employees of the Franklin County school system who felt concern for their colleague and their students. They took steps to calm that concern. Many similarly situated school employees who bear the responsibility of caring for students day in and day out would be tempted to do the same. Would every reasonable school employee in this scenario have understood that what they were doing violated their colleague's constitutional rights? Despite Ms. Lawson's argument in the affirmative, the Court is not convinced. The case law does not support a conclusion that the reasonable non-supervisory school employee should be on notice that a co-worker's personal bag located at the workplace is a protected effect. Because Ms. Lawson has failed to prove that her right to be free from a search in this specific context by two collegial peers is clearly established, defendants Creely and Franke are entitled to qualified immunity. Thus, Ms. Lawson's injury section 1983 claim against Creely and Franke must ultimately fail.

**B**

**1**

The Court next considers Ms. Lawson's claims against Superintendent Kopp, beginning first with the allegation of illegal seizure. "The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266,

273 (2002) (quoting *Terry v. Ohio*, 392 U.S. 1, 9, (1968)).  The Fourth Amendment's prohibitions apply to public school officials.  *New Jersey v. T.L.O.*, 469 U.S. 325, 333 (1985). The Sixth Circuit has reiterated that "there are three types of permissible encounters between the police and citizens" under the Fourth Amendment:  "'(1) the consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigative detention, which, if non-consensual, must be supported by a reasonable, articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause.'"  *United States v. Smith*, 594 F.3d 530, 535 (6th Cir. 2010).

"In order for a seizure to occur, the encounter must not be consensual and the officers must use physical force or the individual must submit to the officers' show of authority."  *Id.* "[A] consensual encounter becomes a seizure when 'in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'"  *United States v. Jones*, 562 F.3d 768, 772 (6th Cir. 2009) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)).  The Sixth Circuit has noted that, "[c]ircumstances indicative of a seizure include 'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'"  *Id.* (quoting *Mendenhall*, 446 U.S. at 554).  Absent the intentional application of physical force, there must also be submission to the show of authority for a seizure to occur even if there is a show of authority and a reasonable person would not feel free to leave.  *Smith*, 594 F.3d at 536.

Here, Ms. Lawson alleges that Superintendent Kopp violated her Fourth Amendment right to be free from unreasonable seizure.  [*See* R. 1.]  Throughout their briefing, Ms. Lawson, Superintendent Kopp, and the Board conflate Fourth Amendment jurisprudence with Fifth

22

Amendment jurisprudence.  There exists an apparent difference between the tests used for Fourth

Amendment and Fifth Amendment inquiries.  *See United States v. Salvo*, 133 F.3d 943, 949 (6th

Cir. 1998) (citing *United States v. Knox*, 839 F.2d 285, 289-91 (6th Cir. 1988)).  Despite their

confusion of the legal standard, the Parties' arguments are simple enough to ascertain.  Ms.

Lawson claims, essentially, that her encounter with Superintendent Kopp on May 5 constituted

an illegal seizure because the circumstances surrounding that morning indicated that she was not

free to leave.  She even insists that the circumstances amounted to a custodial detention.[3]

Superintendent Kopp and the Board counter, with a somewhat clearer understanding of the

appropriate legal standard, that the May 5 encounter was consensual on Ms. Lawson's part, and

that none of the circumstances indicate that a seizure occurred.

The following facts are not in dispute.  On the morning of May 5, Superintendent Kopp

was stationed at the front of the school awaiting Ms. Lawson's arrival.  [R. 36 at 109-10;  R. 52

at 7.]  Upon Ms. Lawson's arrival, Superintendent Kopp asked if Ms. Lawson could answer a

few questions.  [R. 36 at 110;  R. 52 at 7.]  Ms. Lawson followed Superintendent Kopp to the

office of the School Resource Officer ("SRO").  [R. 36 at 110;  R. 52 at 7.]  Upon entering the

SRO's office, Superintendent Kopp closed the door.  [R. 36 at 110;  R. 52 at 7.]  Also present in

the SRO office were the School Resource Officer, Deputy Marvin Kelly, and Safety Coordinator

Jeff Abrams.  [R. 36 at 110;  R. 52 at 7.]  Deputy Kelly and Officer Abrams were both wearing

their sheriff's uniforms, and both had firearms.  [R. 44 at 21;  R. 52 at 20.]  At this point,

Superintendent Kopp informed Ms. Lawson that he had become aware that Ms. Lawson was in

possession of a gun on school grounds.  [R. 36-40; R. 40 at 85, 169.]  Ms. Lawson's response

---

[3] Ms. Lawson's briefing repeatedly insinuates Fifth Amendment precedent and Fifth Amendment analysis.  Her complaint, however, only alleges violations of the Fourth Amendment.  For that reason, the Court declines to venture into the forest of the Fifth Amendment.

was unsure, but she admitted to having a gun with her over the previous weekend.  [R. 36-40; R. 40 at 85, 169.]  Ms. Lawson then went through her purse, where her gun laid at the very bottom.  [R. 36-40; R. 40 at 171.]  Following this discovery, Superintendent Kopp informed Ms. Lawson of her suspension, and Deputy Kelly and Officer Abrams took pictures of the gun before then taking Ms. Lawson's belongings into their possession.  [R. 36-40; R. 40 at 86, 171.]  Ms. Lawson was then walked out of the school and taken to the Franklin County Sheriff's Office.  [R. 36-40; R. 40 at 86.]  The entire encounter took less than four minutes.  [R. 36-40; R. 52 at 19.]

Considering these circumstances, the Court finds that Ms. Lawson was "seized" by Superintendent Kopp under the Fourth Amendment.  Initially, Ms. Lawson agreed to answer questions for Superintendent Lawson.  Had the questioning taken place near the front of the school and out in the open, this case might be like *United States v. Collis*, 766 F.2d 219 (6th Cir. 1985) as Superintendent Kopp and the Board suggest.  [*See* R. 51 at 13.]  In *Collis*, a DEA agent did not seize the defendant when the agent asked the defendant to accompany him to the baggage claim area of an airport and the defendant agreed.  *See Collis*, 766 F.2d at 221.  Ms. Lawson, however, was taken to a private room with the door shut behind her.  This fact alone is not dispositive.  *See Florida v. Bostick*, 501 U.S. 429, 437 (1991) ("Where the encounter takes place is one factor, but it is not the only one.").  But Deputy Kelly and Officer Abrams were present in their uniforms and had their firearms handy.  This "intimidating" behavior would create the reasonable belief that compliance is compelled.  Of course, Superintendent Kopp does not "seize" his employees every time he has to question them.  But the presence of armed law enforcement in the closed-door setting adds something more—it "communicate[s] to a reasonable person that he is not at liberty to ignore the police presence and go about his business."  *Bostick*, 501 U.S. at 437 (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569 (1988).

Because the reasonable person would not have felt free to terminate the encounter under the circumstances presented here, Superintendent Kopp effectuated a seizure.

But our analysis does end there.  Not all seizures are the same.  While custodial arrests require the government to show probable cause, temporary investigative stops require only a reasonable articulable suspicion—a level of justification less than probable cause.  *Smith*, 594 F.3d at 535.  Here, the Court finds that Superintendent Kopp did not custodially arrest Ms. Lawson under the Fourth Amendment.  A custodial arrest in the Fourth Amendment context is akin to a formal arrest—for example, when an individual has been taken into custody by police during a criminal investigation.  *See e.g.*, *United States v. Rogers*, 86 F.4th 259, 263 (6th Cir. 2023).  Because Superintendent Kopp did not effectuate an arrest as understood under the Fourth Amendment, the Court will define Superintendent Kopp's seizure of Ms. Lawson as an investigative detention under the *Terry* framework.

a

 A *Terry* analysis requires the Court to engage in two steps.  *Id.*;  *see also Terry*, 392 U.S. at 22-24.  First, the Court determines there was a proper basis for the stop.  *Smith*, 594 F.3d 530, 535.  Second, if a proper basis exists, "then we must determine whether the degree of intrusion… was reasonably related in scope to the situation at hand."  *Id.* (citation omitted).

An investigatory stop of an individual is proper so long as there is a reasonable basis for the stop.  *Id.* (citing *Terry*, 392 U.S. at 22-24).  A reasonable basis demands that the government agent have a "reasonable, articulable suspicions that [a] person *has been*, is, or is about to be engaged in criminal activity."  *Id.*  (citations omitted) (emphasis in original).  A mere hunch or unparticularized suspicion is not enough to justify a *Terry* stop.  *Id.*  The government agent must be able to articulate some minimal level of objective justification based upon specific reasonable

25

inferences.  *Id.*  "This determination is made in light of the totality of the circumstances."  *Id.*
(citing *Arvizu*, 534 U.S. at 273).

Under the second part of the *Terry* analysis, the Court determines whether the degree of
intrusion was "reasonably related in scope to the situation at hand."  *Id.* (citation omitted).  The
stop must be (1) sufficiently limited in time and (2) the investigative means used must be the
least intrusive means reasonably available.  *Id.*  "The scope of the investigative stop depends on
'the circumstances that originally justified the stop[.]'"  *Id.* (quoting *United States v. Martin*, 289
F.3d 392, 396 (6th Cir. 2002)).  "[I]t is appropriate to consider whether the law enforcement
officers 'diligently pursued a means of investigation that was likely to confirm or dispel their
suspicions quickly, during which time it was necessary to detain the defendant.'"  *Id.* (quoting
*United States v. Sharpe*, 470 U.S. 675, 686 (1985)).

Here, the Court finds that both prongs of *Terry* are satisfied.  First, Superintendent Kopp
had a reasonable basis for the investigative detention.  His statement written May 5 indicates
that, on the day prior, he received a report from the Director of Pupil Personnel, Kyle Sexton,
that Ms. Lawson may have been in possession of a firearm on school property.  [R. 36-40.]
Superintendent Kelly was informed by Mr. Sexton that law enforcement had been notified,
specifically Deputy Kelly.  [R. 36 at 95.]  Superintendent Kopp was also notified by Officer
Abrams over a phone call about the reports of a firearm.  [R. 44 at 14-15.]  With reports from
multiple sources, one of which was law enforcement itself, Superintendent Kopp possessed a
reasonable suspicion that constituted more than a mere "hunch."  Accordingly, he had a proper
basis to effectuate an investigative detention in order to determine whether Ms. Lawson did
indeed possess a firearm on school grounds.

Second, Superintendent Kopp's investigation was reasonable in scope.  He asked Ms.

26

Lawson whether they could talk, and he escorted her to the SRO office.  He then informed Ms. Lawson that he had become aware of a report that she had possessed a firearm on school grounds.  Ms. Lawson equivocated, and then stated she'd had one in her purse the weekend prior.  Ms. Lawson then emptied some of the belongings in her purse to reveal her pistol at the bottom of her bag.  Superintendent Kopp informed Ms. Lawson that she was suspended pursuant to school policy, and Deputy Kelly and Officer Abrams took pictures of the inside of Ms. Lawson's bag.  Ms. Lawson then exited the SRO office and was escorted to Officer Abram's vehicle.  These facts make it apparent that the investigation was sufficiently tied to the circumstances.  Superintendent Kopp used the least intrusive means necessary, which was a simple statement to Ms. Lawson of the report he had received.  This colloquy led to Ms. Lawson digging through her bag to find the gun, which quickly confirmed Superintendent Kopp's suspicions.  Further, the entire encounter in the SRO office took less than four minutes—undoubtedly sufficiently limited in time for Superintendent Kopp to diligently investigate.  *Cf. United States v. Sharpe*, 470 U.S. 675, 686-87 (1985) (where the Supreme Court held that twenty-minute detention of a defendant was not unreasonable because the police acted diligently, and the detention did not involve any unnecessary delay).  Thus, because Superintendent Kopp's investigative detention of Ms. Lawson was supported on a proper basis and was limited in time and scope, Superintendent Kopp's seizure of Ms. Lawson was permissible under the Fourth Amendment.

### 2

The Court next considers whether Superintendent Kopp violated Ms. Lawon's Fourth Amendment right to be free from unreasonable search.  A person may waive their Fourth Amendment right to be from unreasonable search if they freely and voluntarily consent to a search.  *United States v. Tellez*, 86 F.4th 1148, 1151 (2023) (citing *Schneckloth v. Bustamonte*,

412 U.S. 218, 222 (1973)).  "Whether . . . consent was given freely and voluntarily is 'a question of fact to be determined from the totality of all the circumstances.'"  *Id*. (quoting *Bustamonte*, 412 U.S. at 227).  The analysis is fact-specific—there is no "magic formula" for determining consent.  *Id*.  The Court looks for factors such as "the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; whether the individual understands his or her constitutional rights; the length and nature of the detention; and the use of coercive or punishing conduct by the police."  *Id*. (citation omitted).  Consent need not be verbal; it can be communicated through gestures or conduct.  *Id*. at 1152.

Here, Ms. Lawson contends that Superintendent Kopp violated her Fourth Amendment right from unreasonable search during the events transpiring on May 5.  [R. 1, ¶ 32.] Superintendent Kopp and the Board argue that there exists no evidence that Ms. Lawson was asked or compelled to reveal the contents of her bag.  [R. 51 at 15.]  They point to the fact that Ms. Lawson was the one who asked Superintendent Kopp whether she needed to look in her bag for a firearm.  *Id*.  They also rely on the fact that Ms. Lawson looked through her the purse on her own.  *Id*.  According to Superintendent Kopp and the Board, the circumstances were not such that Ms. Lawson would have felt coerced into looking through her purse.  *Id*.  Ms. Lawson's briefing fails to substantively respond to any of these arguments.  [*See* R. 52; R. 55; R. 59.]

Ultimately, the record demonstrates that Ms. Lawson consented to the search.  Ms. Lawson admits that Superintendent Kopp did not ask whether he could look inside her purse.  [R. 40 at 170.]  Rather, she was the one who instigated the process of looking through the purse's contents.  *Id*.  Even if, as Ms. Lawson testified, Superintendent Kopp confirmed that Ms. Lawson needed to look in her bag [*see* R. 40 at 170,] Ms. Lawson's instigation of the search suggests that she freely and voluntarily consented to any investigation of her bag's contents.  Further

supporting this conclusion is the fact that Ms. Lawson looked through the bag herself—Superintendent Kopp never touched nor actually searched Ms. Lawson's bag.  Accordingly, to the extent that any "search" by Superintendent Kopp actually occurred, it was consented to freely and voluntarily by Ms. Lawson.  For that reason, no illegal search occurred.

C

Finally, the Court turns to Ms. Lawson's claim against the Franklin County Board of Education.  "[U]nder § 1983, local governments are responsible only for their own illegal acts. They are not vicariously liable under § 1983 for their employees' actions." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (citations omitted and internal quotation marks omitted). "Instead, a municipality is liable under § 1983 only if the challenged conduct occurs pursuant to a municipality's 'official policy,' such that the municipality's promulgation or adoption of the policy can be said to have 'cause[d]' one of its employees to violate the plaintiff's constitutional rights." *D'Ambrosio v. Marino*, 747 F.3d 378, 386 (6th Cir. 2014) (quoting *Monell*, 436 U.S. at 692).

To establish the existence of a municipality's official policy, a plaintiff must prove: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance [of] . . . or acquiescence [to] federal rights violations." *Id.*  Here, Ms. Lawson tries to prove the existence of an official policy through the first, second, and third theories.  [R. 52 at 9-18.]  Ms. Lawson's proof under the second theory relies on the actions of Superintendent Kopp.  Because the Court has determined that Superintendent Kopp's actions were not illegal, the Court will analyze Ms. Lawson's proof under the first and third theories, which relate to the illegal search by Creely and Franke.

**1**

Under the first *Monell* theory, Ms. Lawson argues that Board policy required the reporting of unsafe working conditions to the Superintendent. *Id*. at 17. Moreover, Ms. Lawson contends that Creely and Franke had "unfettered authority and discretion" to enforce that policy. *Id*. at 13. Board policy permits "all employees to use sound judgment in the performance of their duties and to take reasonable measures to protect the health, safety, and well-being of others, as well as District property." [R. 38-8.] Ms. Lawson avers that, essentially, because Creely and Franke were required to report any unsafe working conditions to the Superintendent, the Board's "open ended" policy permitted, and even encouraged, Creely and Franke to undertake the search of Ms. Lawson's purse.

Ms. Lawson's redundant argumentation about the seemingly draconian nature of contemporary school safety protocol fails to explain precisely how the Board's policy is illegal. Hence, the Court will not strain itself assessing the legality of the Board's policies. But in her lengthy briefing, Ms. Lawson also relies on *Monistere v. City of Memphis*, which reinforces the principle that "a municipality may be liable if an employee's application of an otherwise constitutional policy leads to an unconstitutional result." 115 Fed. Appx. 845, 850 (6th Cir. 2004) (citations omitted). According to Ms. Lawson, *Monistere* supports her proposition that "unfettered discretion of employees regarding a policy that ostensibly permits conduct that is a constitutional violation gives rise to Monell liability." [R. 52 at 16.] For Ms. Lawson's theory to be correct, however, she must draw a causal connection between the policy and the action. In other words, she must show that Creely and Franke were relying on the Board's policy when they performed the illegal search. She cannot do so.

Ms. Lawson reiterates that Creely and Franke were only at the school on May 4 because

of their employment, that they were on the clock when the search occurred, and that they only had access to Ms. Lawson's office and purse because of their employment at the school.  [R. 52 at 18.]  Despite these facts, they do not *ipso facto* indicate Creely's and Franke's reliance on Board policy in undertaking their actions.  Moreover, Ms. Lawson herself admits to the lack of evidence supporting her proposition.  Citing their deposition testimony, Ms. Lawson points out that "Ms. Creely and Ms. Franke could not say whether or not school policies prohibited or permitted them to search Ms. Lawson's purse." *Id*. (citing R. 38 at 51, 97-98; R. 39 at 60).  Ms. Lawson argues that Creely's and Franke's uncertainty indicates that they "acted pursuant to their practically unlimited discretion under school board policy." *Id*.  That logic, however, is incorrect.  If they could not say whether or not Board policy prohibited or permitted them to search Ms. Lawson's purse because they had limited knowledge and understanding, then Creely and Franke surely could *not* have been relying on Board policy.  By analogy, one cannot blindly experiment with an Old Fashioned cocktail by adding an extra dash of bitters, and then later credit a recipe of which they previously had no knowledge.  Likewise, without any material knowledge of their discretion under school or Board policy, Creely and Franke cannot be said to have been exercising such discretion pursuant to Board policy.  Thus, there is no causal link connecting Creely's and Franke's unconstitutional actions to any Board policy.  Accordingly, Ms. Lawson's argument under the first *Monell* theory fails.

### 2

Ms. Lawson contends, in the alternative, that the Board is liable under *Monell*'s failure to train theory.  Inadequate training can be the basis for Monell municipal liability if it "amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Roell v. Hamilton Cty., Ohio/Hamilton Cty. Bd. of Cty. Commissioners*, 870 F.3d 471, 487 (6th Cir.

2017) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).  To succeed on an inadequate training claim, a plaintiff must prove: "(1) that a training program is inadequate to the tasks that the officers must perform; (2) that the inadequacy is the result of the [municipality's] deliberate indifference; and (3) that the inadequacy is closely related to or actually caused the plaintiff's injury."  *Id.* at 487 (quoting *Brown v. Chapman*, 814 F.3d 447, 463 (6th Cir. 2016)). Additionally, "[t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program."  *City of Canton*, 489 U.S. at 390–91 (citations omitted); *see also Winkler v. Madison Cty.*, 893 F.3d 877, 904 (6th Cir. 2018).

Ms. Lawson argues that school policies and handbooks gave employees like Creely and Franke "unfettered authority and discretion," but they lacked training on "what was appropriate action pursuant to the policy at issue."  [R. 52 at 12.]  Ms. Lawson focuses specifically on the Board's policy that permits school employees to take reasonable measures to preserve the health, safety, and well-being of others.  *Id.* at 13.  She points to the Board's admission that there is a lack of specific training or educational material as to what constitutes "reasonable measures."  *Id.* Ms. Lawson declares that "[t]o put such broad policies in place with no guidance to staff is the exact policy to create an atmosphere where staff is emboldened to engage in the Constitutional violation that occurred in this instance."  *Id.*  According to her, the failure to train is a deliberate indifference that make searches like the one in this case an "inevitability" and that, "[b]ut for the Board's failure to train on what is a reasonable measure to protect the health, safety, and wellbeing of others, the search of Ms. Lawson's purse would have never occurred."  *Id.*

For similar reasons to those discussed above, Ms. Lawson's argument fails.  First, Ms. Lawson cannot provide proof that Creely and Franke were acting pursuant to school policy when

they searched Ms. Lawson's bag—indeed, Creely had never even *seen* the policy that Ms. Lawson's argument rests on.  [R. 38 at 91-92.]  Thus, it cannot be concluded that any training inadequacy is closely related to or actually caused Ms. Lawson's injury.

Moreover, Ms. Lawson's argument is purely an *ipse dixit*.  Her contentions that the Board's training is "clearly inadequate" is conclusory.  She asks the Court to assume with her that such broad policies with no guidance create an atmosphere that emboldens staff to engage in the Constitutional violation that occurred here.  That assumption, without more, does nothing to prove that training is inadequate.  She also argues that "but for" the Board's failure to train, the search of Ms. Lawson's bag would have never occurred.  Again, that statement by itself does nothing to show that the training is inadequate or that the inadequacy is the result of the Board's deliberate indifference.

The Sixth Circuit has previously identified two types of situations that would justify a conclusion of deliberate indifference for a failure to train.  "One is failure to provide adequate training in light of foreseeable consequences that could result from the lack of instruction." *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999).  The other type of situation is "where the city fails to act in response to repeated complaints of constitutional violations by its officers." *Id*. Beyond her mere allegations, Ms. Lawson points to no evidence in the record that would tend to indicate Creely's and Franke's actions were foreseeable.  Nor has she produced evidence indicating that the Board has failed to act in response to repeated complaints.  Because she is unable to proffer any evidence satisfying the failure to train elements, Ms. Lawson's argument under this *Monell* theory cannot succeed.

### III

School employees and officials are bestowed with a societal responsibility to keep their

pupils safe from harm.  As this case demonstrates, that high degree of responsibility can sometimes conflict with the individual rights of others.  Here, Holly Lawson's individual rights were infringed by her colleagues.  For the reasons explained above, however, her civil action cannot succeed.  Accordingly, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** as follows:

1. Defendants Kayla Creely's and Lori Franke's Motion for Summary Judgment [**R. 30**] is **GRANTED**;

2. Plaintiff Holly Lawson's Motion for Partial Summary Judgment [**R. 47**] is **DENIED**;

3. Defendants Mark Kopp's and the Franklin County Board of Education's Motion for Summary Judgment [**R. 51**] is **GRANTED**;

4. Plaintiff Holly Lawson's Motion for Partial Summary Judgment [**R. 52**] is **DENIED**; and

5. Judgment in favor of the Defendants **SHALL** be entered promptly.

This the 13th day of June 2024.

Gregory F. Van Tatenhove
United States District Judge